**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

RICKY PANAYOTY;[1] ANGELO BONILLA; and
ANTHONY YOUNG,

Plaintiffs,

- v -                                              Civ. No. 9:11-CV-159
                                                              (DNH/RFT)

ANTHONY J. ANNUCCI, *Executive Deputy Commissioner*;
JOHN NUTTALL, *Deputy Commissioner for Program*;
LUCIEN LeCLAIRE, JR., *Facility Operations*; MARK LEONARD,
*Director of Ministerial Service*; JAMES A. NICHOLS, *Mid-Orange
Correctional Facility*; K.F. KELLER, *Former Acting Superintendent
of Mid-Orange*; BRIAN FISCHER, *Department of Correctional Services*,

Defendants.

**APPEARANCES:**                                **OF COUNSEL:**

ANGELO BONILLA
Plaintiff, *Pro Se*
08-R-2599
Otisville Correctional Facility
Box 8
Otisville, New York 10963

ANTHONY YOUNG
Plaintiff, *Pro Se*
10-R-797
Riverview Correctional Facility
P.O. Box 247
Ogdensburg, New York 13669

---

[1] On November 10, 2008, Ricky Panayoty initiated this action by filing a civil rights Complaint in the Southern District of New York (S.D.N.Y.). Dkt. No. 2, Compl. At that time he was incarcerated in the Mid-Orange Correctional Facility, which is located within the jurisdiction of the S.D.N.Y. Although he endeavored to bring this action as a class action, it was made clear to Panayoty that he was the sole Plaintiff. *See* Dkt. Nos. 2, Compl., 4, Am. Compl., & 37, Conf. Tr. at pp. 5-7 (court explains to Panayoty during a conference that, as a *pro se* litigant, he could only represent himself and could not bring a class action). Because his custodial sentence with the Department of Corrections and Community Supervision (DOCCS) was set to expire prior to the culmination of the lawsuit, Panayoty moved to amend his pleading in order to join two other inmates, namely, Messrs. Young and Bonilla, who at that time were incarcerated in Riverview Correctional Facility and still had a few years of incarceration left in their respective sentences. Dkt. Nos. 40 & 55. Upon Panayoty's release from DOCCS' custody, Defendants moved to dismiss the action as moot in light of the fact that Panayoty sought only injunctive and declaratory relief. Dkt. Nos. 42 & 43. On February 7, 2011, the Honorable George B. Daniels, United States District Judge for the S.D.N.Y., granted Panayoty's request to amend to add two new parties and granted Defendants' request to dismiss Panayoty from the lawsuit. Dkt. No. 53. Because the remaining Plaintiffs were housed in Riverview Correctional Facility, which is located in the Northern District of New York (N.D.N.Y.), there was no longer sufficient ties to the S.D.N.Y. and the case was duly transferred to this District. *Id.*

HON. ERIC T. SCHNEIDERMAN       ADELE M. TAYLOR-SCOTT, ESQ.
Attorney General of the State of New York   Assistant Attorney General
Attorney for Defendants[2]
The Capitol
Albany, New York 12224

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION and ORDER

Plaintiffs Angelo Bonilla and Anthony Young, who are inmates in the custody of the New York State Department of Corrections and Community Supervision (DOCCS),[3] bring this civil rights action against various DOCCS officials. Dkt. No. 55, 2d Am. Compl.; *see also supra* note 1. Both Plaintiffs are members of the Nations of Gods and Earth (NGE) and assert that various DOCCS prison regulations, which place certain restrictions on members of NGE, violate 1) their right to freely practice their religion under the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.*; and 2) their right to equal protection under the Fourteenth Amendment. *Id.* Defendants move for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. Dkt. No. 67. Plaintiff Bonilla filed a Response in Opposition to this Motion. Dkt. No. 69. To date, the Court has not received a response from Plaintiff Young. For the reasons that follow, this Court recommends **granting in part and denying in part** Defendants' Motion.

## I. BACKGROUND and MATERIAL FACTS

Much of the facts associated with this action are generally agreed upon, but with some

---

[2] To date, Mr. Keller has not been properly served with process, thus no appearance has been made by Defendants' counsel on his behalf. *See, e.g.,* Dkt. No. 56 at p. 1, n. 1.

[3] In April 2011, the New York State Department of Correctional Services and the Division of Parole were merged into one entity, now referred to as the Department of Corrections and Community Supervision.

important exceptions.  A brief historical narrative is warranted in order to put the issues in this litigation into perspective.[4]

The Nation of Gods and Earth was founded in the 1960s by Clarence 13X Smith, who was an associate of Malcom X and was previously a member of the Nation of Islam (NOI).  *See* Dkt. No. 67-3, Adele Taylor Scott, Esq., Decl., dated Feb. 24, 2012, Ex. C, Angelo Bonilla Dep., dated Nov. 4, 2011, at p. 18;[5] *Marria v. Broaddus*, 200 F. Supp. 2d 280, 282-83 (S.D.N.Y. 2002) ("*Marria I*"). "The name 'Nation of Gods and Earth' is derived from the belief that male members of the group are 'Gods,' while females are called 'Earths[;]'. . . . Clarence 13X taught his followers that they "were God the same way he was."  *Wright v. Fayram*, 2012 WL 2312076, at *2 (N.D. Iowa June 18, 2012).  NGE adherents study the Bible, the Koran, and the Torah, but more from an historical perspective, and NGE members do not believe in a "mystery" or unseen god.  *Id.*; Bonilla Dep. at pp. 15, 25, & 46.  Sometimes, members of NGE are also referred to as the Five Percenters, a colloquial name derived from NOI leader Elijah Muhammad,

> who separated the world's population into three categories: the Five Percent, the Ten Percent, and the Eighty-Five Percent.  According to Elijah Muhammad, the Ten Percent teach the Eighty-Five Percent to believe in the existence of a "mystery God" and thereby keep the Eighty-Five Percent enslaved by having them worship something that they cannot see. . . . Muhammad characterized the remaining Five Percent as the poor, righteous teachers who do not believe in the teachings of the Ten Percent and instead teach the identity of the true and living God, as well as freedom, justice, and equality to all human families of the planet earth.

*Marria v. Broaddus*, 2003 WL 21782633, at *1 (S.D.N.Y. July 31, 2003) ("*Marria II*") (internal citations omitted); *see also* Bonilla Dep. at p. 30 ("A Five Percenter is a righteous person who knows

---

[4] We are providing this historical background solely as a backdrop to foster an understanding of the evolution of the NGE, both in and out of the prison context.  This recitation is taken, somewhat, from decisions issued by other district courts.  It is important to note that this historical narrative is not at issue amongst the parties, and the fact that we are adopting another court's findings on such history in no way binds us to accept that same court's findings when deciding substantive matters in the Motion currently before this Court.

[5] All page references to Bonilla's Deposition are to the Deposition Transcript pages, not the page numbers automatically assigned by the Court's Case Management Electronic Case Files System.

. . . the truth and the mystery of God.").

The central text studied by NGE members is known as the 120 Degrees, which is also studied by members in NOI. *Marria II*, 2003 WL 21782633, at *1-2. Additionally, NGE members utilize "two numerology devices known as the Supreme Alphabet and Supreme Mathematics." *Id*. at *3. The three forms of central NGE literature have been described as follows:

> The 120 Degrees are lessons arranged in a question and answer format that represent the teachings of NOI founder Master Fard Muhammad and Elijah Muhammad. The Supreme Alphabet and Supreme Mathematics assign a word to each letter of the alphabet (almost all of which begin with the letter to which they correspond) and ten "righteous" principles to each number from 0 to 9. They are used as keys "to understand[ing] man's relationship to the universe and Islam," as well as to understanding and interpreting the 120 Degrees.

*Id*. (citations omitted).

An additional piece of NGE literature is a monthly newspaper called *The Five Percenter*. This periodical, published by the Allah Youth Center (founded by Clarence 13X), "contains articles about current events relevant to the Nation, information about community activities, letters to the editor, editorials, and Fiver Percenter lessons and 'plus lessons,' including teachings from the 120 Degrees, the Supreme Alphabet, and the Supreme Mathematics." *Id*. (citations omitted).

Members of NGE also have congregative gatherings known as Civilization Classes, Parliaments, and Rallies, as well as certain Honor Days, such as Allah's birthday (celebrated on the day Clarence Smith was born). *Id*. at *4; *see also* Bonilla Dep. at pp. 33-34. The *Marria* Court explained these congregative activities as follows:

> [T]he Nation conducts "Civilization Classes," in which more senior members – i.e., those who have studied the lessons longer than others – educate newer members about the lessons and how they can be applied. . . . Nation members also gather regularly for "Parliaments" and "Rallies." During these gatherings, members come together to help one another learn their lessons, to educate one another by conversing about the lessons' meaning and application (which they call "building"), and to make decisions as a community.

*-4-*

*Marria II*, 2003 WL 27182633, at *4 (internal citations omitted); Bonilla Dep. at pp. 41-42 & 51-52.

NGE members also use an official symbol referred to as the Universal Flag.  According to Bonilla's testimony,

> [t]he stars are yellow and black . . . . symboliz[ing] the sun, black is for the black person . . . . [and] yellow is for every other color person.  And inside of it we have seven that[] comes from our mathematics seven – the seventh letter in the alphabet is G for God.  We have a moon, which is the woman and we have a star which is a child.

Bonilla Dep. at p. 49.

The Universal Flag is displayed on all NGE literature as well as crowns.  *Id*. at pp. 49-50.  The crowns are similar to a kufi worn by Muslims, except that they often have tassels on them symbolizing the planet and the moon, with the person representing the sun.  *Id*. at p. 50.  Crowns are worn during Parliaments and symbolize a person's status within the NGE.  *Id*. at p. 52.

According to Defendant Anthony Annucci, DOCCS Executive Deputy Commissioner, during the 1990s, "the proliferation of gangs and gang related activities inside the New York State prison system reached critical levels and presented a very serious threat to security."  Dkt. No. 67-2, Anthony Annucci Decl., dated Feb. 23, 2012, at ¶ 6.  One group identified as perpetrators of gang activity was a group known as the "Five Percenters."  *Id*. at ¶ 7.  DOCCS personnel worried that "'Five Percenter' literature was being used as a means of legitimizing the gang and recruiting new members, and that the flags and other Five Percenter insignia and symbols were used as a means of gang identification."  *Id*. at ¶ 9.  Similarly, there was concern that the "Supreme Alphabet" and "Supreme Numbers" were used as a code by which messages were sent amongst inmates to plan gang activity.  *Id*. at ¶ 10.  In response, DOCCS classified "Five Percenters" as an "unauthorized" group, "and viewed membership in that group as an organized threat to prison security."  *Id*. at ¶ 11.  No distinction was made between so-called "Five Percenters" and NGE adherents, and a total ban

on all NGE literature, and anything containing NGE symbols or emblems, was instituted.  *Id*., Ex. B.  Thus, any inmate found in possession of the Supreme Alphabet, Supreme Mathematics, *The Fiver Percenter* publication, the NGE flag, and/or the 120 Degrees[6] would be disciplined for possessing contraband.

In 2003, however, following a non-jury trial, the Honorable Naomi R. Buchwald, United States District Judge for the S.D.N.Y., ruled that the inmate-plaintiff's beliefs in NGE were both sincere and religious in nature thus entitling him to RLUIPA and First Amendment protections, and further found that DOCCS' classification of NGE as a security threat and the total ban on NGE literature violated the prisoner-plaintiff's free exercise rights under the First Amendment and RLUIPA.  *Marria II*, 2003 WL 21782633.  In rendering this ruling, Judge Buchwald recognized the important security interest DOCCS has and the "possibility that 'the Five Percenters' may somewhat uniquely connote *both* a religion *and* a gang in the New York State prison system (though the sincere religious adherents and gang members may not be the same inmates)."  *Id*. at *18 (emphasis in original).  Nevertheless, because DOCCS' policy of a total ban was not the least restrictive means to further its compelling security interest, District Judge Buchwald directed that certain relief be afforded to NGE adherents, such as the right of NGE adherents to possess a copy of the 120 Degrees, the Supreme Alphabet, and the Supreme Mathematics.  *Id*. at *18-20.  Other issues, such as *The Five Percenter*, symbols such as the Universal Flag, congregational opportunities, and observance of Honor Days, were referred back to DOCCS "to make a determination about the feasibility of allowing sincere adherents . . . to possess literature and to engage in religious practices in light of its security concerns."  *Id*. at *20.  The court warned DOCCS that in reevaluating its

---

[6] At that time, only registered members of NOI were allowed to possess the 120 Degrees and they were not allowed to share the text with any inmate not registered as NOI.  *Marria I*, 200 F. Supp. 2d at 283-84 and n.3.

policies, it must rid itself of the idea that all Five Percenters are gang members. *Id*. at *21.

In response to the remand, DOCCS drafted Protocols which, along with a "supplementary record," were presented to and approved by District Judge Buchwald. *Marria v. Broaddus*, 2004 WL 1724984 (S.D.N.Y. July 30, 2004) ("*Marria III*"). Following court approval, the Protocols, as summarized below (*see* Annucci Decl., Ex. D), were instituted by DOCCS:

1) Inmates professing to be sincere adherents to NGE must register as members of the group.

2) Registered NGE members may possess the 120 Degrees, Supreme Alphabet, and Supreme Mathematics for personal study in their cells. These texts are not allowed to be displayed or copied, and cannot be shared with an inmate who is not registered as NGE. Furthermore, the Universal Flag, or other symbols displayed on these texts, are not to be displayed in the cell.

3) DOCCS will arrange for *The Five Percenter* newspaper to be maintained in each correctional facility's law library, subject to the media review guidelines set forth in Directive # 4572.

4) NGE registrants are permitted to order and receive other publications from NGE organizations, as long as that organization is registered with DOCCS' Division of Ministerial and Family Services.

5) DOCCS will consider requests from an approved organization of NGE to identify days to be observed as religious fast days, which will be observed in the inmate's cell.[7]

6) Inmates registered as NGE may meet one-on-one with an outside volunteer affiliated with NGE in facility legal visiting rooms during normal visiting hours.

At issue in this litigation are the purported shortcomings of these Protocols, in that they do not allow opportunities for NGE members to congregate in Civilization Classes, Rallies, and

---

[7] For example, in 2009, DOCCS approved inmate observation of the following NGE Honor Days: February 22, Allah's Physical Birthday; June 13, Allah's Show and Prove; August 28, Allah's Social; and October 10, Birth of the NGE. Annucci Decl., Ex. E. For each Honor Day, NGE adherents receive breakfast bags prior to sunrise and dinner meals after sundown; meals are consumed inside the inmate's cell; and "[t]here is no congregate activity whatsover." *Id*.

Parliaments, in order to garner better understanding of the teachings of NGE, nor do the Protocols allow for congregate celebration of the NGE Honor Days. Yet, all other recognized religions do not suffer from such restrictions and their members are able to attend weekly services and congregate on holy days. Furthermore, Plaintiffs complain that the Protocols prohibit NGE registrants from displaying their symbols, flags, or wearing crowns. *See* 2d Am. Compl.; *see also* Bonilla Dep. at p. 31. Plaintiffs assert that the restrictions substantially burden their free exercise of religion and fail to provide equal protection to their religious beliefs. Defendants assert that the Protocols were approved by a federal district court and should similarly be upheld herein and that these Protocols are narrowly tailored to accomplish their serious security concerns.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey*

*v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## B. Defendants Nichols and Keller

As an initial matter, we note that Defendants Nichols and Keller should be dismissed from this lawsuit.[8]  Both of these Defendants were initially included in this action by the original Plaintiff, Ricky Panayoty, who at the time this action began was housed at Mid-Orange Correctional Facility. While the action was pending in the S.D.N.Y., Panayoty was transferred to the Riverview Correctional Facility, where he met Angelo Bonilla and Anthony Young; Bonilla and Young were never housed at Mid-Orange nor do they appear to assert any claim against any official at Mid-Orange.  *See, e.g.,* Dkt. No. 67-3, Bonilla Dep. at pp. 39-40 (testifying that he never had any dealings with Keller and Nichols and that they hadn't done anything to him).  Because Panayoty was released from incarceration and dismissed from this action, and because only injunctive relief is sought herein, the claims against Defendants Keller and Nichols are moot.  *Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996) ("[A] transfer to another facility moots an action for injunctive relief against the transferring facility."); *Hallett v. New York State Dep't of Corr. Servs.*, 109 F. Supp. 2d 190, 196 (S.D.N.Y. 2000) (noting that where a prisoner has been released from prison, his claims for injunctive relief based on the conditions of his incarceration must be dismissed as moot).  This result is consistent with the general proposition that "an actual controversy must be extant at all stages of the case, not just at the time the complaint is filed."  *Beyah v. Coughlin*, 789 F.2d 986, 988 (2d Cir. 1986) (cited in *Thompson   v. Carter*, 284 F.3d 411, 415 (2d Cir. 2002)).  Thus, we recommend that Defendants' Motion for Summary Judgment be **granted** as to Defendant Nichols

---

[8] Upon information and belief, Defendant Keller is the Acting Superintendent of the Mid-Orange Correctional Facility.  Dkt. No. 67-4, Defs.' Mem. of Law at p. 7.  Although he has not been served with process in this matter, his dismissal from the lawsuit is nonetheless warranted as explained herein.

and that he be **dismissed** from this action.  We further recommend that Defendant Keller, who has never been served with process, be **dismissed** from this lawsuit as the claims stated against him were clearly rendered moot with the removal of Plaintiff Panayoty from this action.

## C.  *Stare Decisis*

By their Motion, Defendants principally ask this Court to uphold the prior holdings rendered by District Judge Buchwald in the S.D.N.Y. in *Marria II*, 2003 WL 21782633 (S.D.N.Y. July 31, 2003) and *Marria III*, 2004 WL 1724984 (S.D.N.Y. July 30, 2004), wherein DOCCS' Protocols concerning NGE were adopted and deemed constitutional.  In making this argument, Defendants assert that this Court should be guided, and indeed bound, by the philosophy of *stare decisis*, and should uphold the Protocols absent the Plaintiffs' showing of "special justification."  Dkt. No. 67-4, Defs.' Mem. of Law, at pp. 8-9.

The doctrine of *stare decisis* "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decision, and contributes to the actual and perceived integrity of the judicial process."  *Payne v. Tenn.*, 501 U.S. 808, 827 (1991).  Of course, even those courts bound by this doctrine note that, while the doctrine is preferable, it "is not an inexorable command; rather it is a principle of policy and not a mechanical formula of adherence to the latest decision."  *Id*. at 827-28 (internal quotation marks and citations omitted).

Defendants' reliance on this doctrine as it pertains to the *Marria* decisions in the S.D.N.Y. and its compulsory effect upon this Court is utterly misplaced.  There are two general applications of this doctrine, vertical and horizontal, and the precedential value/effect of a prior opinion varies "depending on the relationship between the court rendering the judgment and the court that is asked to give the prior judgment precedential effect."  18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL

PRACTICE § 134.02[1][a] (3d ed. 2012).  With vertical *stare decisis*, the decisions of an appellate

court, *i.e.,* a circuit court of appeals or the Supreme Court, will have preclusive effect on subsequent

decisions made by lower courts.  With horizontal *stare decisis*, the decisions of an appellate court

have no preclusive effect on subsequent decisions made within that same court, though great weight

may be given to the prior decision.  However, the doctrine of *stare decisis* is <u>not</u> applicable to

coordinate courts, *i.e.*, district courts located in different judicial districts.  *See* MOORE'S FEDERAL

PRACTICE at § 134.02[1][d] ("A decision of a federal district court judge is not binding precedent

in either a different judicial district, the same judicial district, or even upon the same judge in a

different case.").  At best, the prior district court ruling provides persuasive authority for the

subsequent lateral court, but there is no precedent which states that a subsequent district court is in

any way bound by a prior district court ruling.[9]  Therefore, the rulings made in the S.D.N.Y. by

Judge Buchwald are  in no way binding upon this Court and we recommend **denying** Defendants'

request for summary judgment based upon the doctrine of *stare decisis*.

### D.  Plaintiffs' Claims

As noted above, Plaintiffs bring this action for declarative and injunctive relief pursuant to

the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.*,

and pursuant to 42 U.S.C. § 1983 asserting violations of their First Amendment right to religious

freedom and Fourteenth Amendment right to equal protection.  Specifically, they ask that the

Protocols be repealed and DOCCS be required to

---

[9] In support of the idea that this Court should, absent "special justification," uphold the constitutionality of the *Marria*/DOCCS NGE Protocols based upon *stare decisis*, Defendants cite *McKethan v. New York State Dep't of Corr. Servs.*, 2011 WL 4357375, at *5 (S.D.N.Y. Sept. 16, 2011), wherein the court ruled that the plaintiff, who challenged the shortcomings of the Protocols for failing to allow for, *inter alia*, NGE congregation, failed to allege new facts that would require the court to review the prior determination.  Notably, however, the *McKethan* decision was issued by the same judge who presided over the *Marria* case, District Judge Buchwald.

formulate a revised policy for sincere adherents of the NGE that affords the full and equal opportunity to participate in, without discrimination, group observance of NGE Honor Days, Civilization classes, Rallies and Parliaments, permit the wearing of crowns (with or without tassels) and display of the Universal Flag; provide a multi-purpose, all purpose, or shared area for the above-mentioned meetings, and that NGE adherents be permitted to bring their lessons and materials to such meetings, and that NGE adherents be permitted to purchase approved NGE materials, publications, and symbols from NGE vendors, and for any further relief the Court deems just and proper.

2d Am. Compl., Relief.

### 1.  First Amendment and RLUIPA

Prisoners maintain some measure of constitutional protection afforded by the Free Exercise Clause of the First Amendment. *Pell v. Procunier*, 417 U.S. 817, 822 (1974); *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999).  Such rights, however, are balanced against the "interests of prison officials charged with complex duties arising from administration of the penal system." *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990).  A prisoner's free exercise claim is therefore "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Farid v. Smith*, 850 F.2d 917, 925 (2d Cir. 1988) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)); *see also Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003).  Thus, a prison regulation that impinges upon an inmate's constitutional rights may be valid, despite such encroachment, if it is reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89 (1987); *Farid v. Smith*, 850 F.2d at 925.  The underlying purpose of the implementation of a lower standard is congruous with the notion that "evaluation of penological objectives is committed to the considered judgment of prison administrators, 'who are actually charged with and trained in the running of the particular institution under examination.'" *O'Lone v. Estate of Shabazz*, 482 U.S. at 349 (quoting *Bell v. Wolfish*, 441 U.S. 520, 562 (1979)).

The Second Circuit directs that courts faced with constitutional free exercise claims must

first assess, "(1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective." *Farid v. Smith*, 850 F.2d at 926.

Turning to the other component of the free exercise claim, we note that RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion."[10] *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005).  RLUIPA  provides that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
>> (1) is in furtherance of a compelling governmental interest; and
>> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

Thus, a prisoner can establish an RLUIPA violation by proving that the prison regulation at issue constitutes a "substantial burden" on his religious exercise without promoting a compelling governmental interest that is advanced through the least restrictive means.  As such, RLUIPA places a much higher burden on defendants than does the First Amendment.  RLUIPA does not define "substantial burden," however the Second Circuit has assumed that "[s]ince substantial burden is a term of art in the Supreme Court's free exercise jurisprudence we assume that Congress, by using

---

[10] RLUIPA was enacted in the wake of the Supreme Court's invalidation of the Religious Freedom Restoration Act of 1993 (RFRA) in *City of Boerne v. Flores*, 521 U.S. 507 (1997), on the grounds that it exceeded Congress's power under section five of the Fourteenth Amendment ("The Congress shall have power to enforce this article by appropriate legislation").  RLUIPA "corrected the constitutional infirmity of RFRA by invoking federal authority under the Spending Clauses to reach any program or activity that receives federal financial assistance, thereby encompassing every state prison." *Fluellen v. Goord*, 2007 WL 4560597, at *5 (W.D.N.Y. Mar. 12, 2007) (citations omitted).

it, planned to incorporate the cluster of ideas associated with the Court's use of it." *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007) (citations omitted).  The Supreme Court has held that a substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs."  *Thomas v. Review Bd. of Ind. Emp't Sec. Div*., 450 U.S. 707, 718 (1981) (cited in *Vill. of Mamaroneck*).

At issue in this lawsuit is Plaintiffs' ability to congregate with other NGE adherents to discuss and learn the teachings of NGE and to observe/celebrate certain Honor Days.  They also seek the ability to display NGE symbols, both in their cell (in the case of the Universal Flag) and on their person (in the case of their crowns) so as not to be relegated to practicing their beliefs under a cloak of secrecy.  In separate Declarations, submitted by Defendants in their Motion, both Plaintiffs profess to be sincere adherents of NGE.  Dkt. No. 67-3, Adele Taylor Scott, Esq., Decl., dated Feb. 24, 2012, Exs. A, Angelo Bonilla Decl., dated July 27, 2010, & B, Anthony Young, Decl., dated July 28, 2010.  And, each Plaintiff explains the importance of congregation as it relates to NGE. Specifically, Bonilla notes that the Protocols only enable him to study his religion on his own by providing him access to the 120 Degrees, Supreme Mathematics, Supreme Alphabet, and *The Five Percenter*; but, by denying his right to congregate with other NGE adherents, he is denied the right to practice his "beliefs in accordance with the Nation's customs."  Bonilla Decl. at ¶ 15; *see also* Bonilla Dep. at p. 41 (explaining how congregation in both study and celebration is integral to obtaining spiritual righteousness).  Bonilla's membership in NGE spans twelve years, dating back to before he was incarcerated.  *Id*. at ¶¶ 1-2.  "While on the outside, [Bonilla] was required to participate in Civilization (study group) Classes to get a better understanding of the Nation's tenets. This included writing essays, giving speeches, reciting 120 lessons, and elaborating on Supreme

-15-

Mathematics." *Id*. at ¶ 2. He further explains that "[i]t is customary for each Nation member to recite the day's Supreme Mathematics and show and prove their moral and righteous application in everyday life. The same is done by reciting lessons contained in the 120 Lessons." *Id*. at ¶ 3. While in the custody of DOCCS, he has not been allowed to congregate with other NGE members, thus denying him "spiritual growth, moral and cultural development, and a positive understanding of how to get thru [sic] life's trials and tribulations." *Id*. at ¶ 14.

Similarly, Anthony Young declares that he has been a member of NGE since 1985 and that "Nation adherents are required, encouraged, and counseled to participate, whenever possible, in Civilization Classes, Rallies, and Parliaments in order to collectively understand and practice [their] beliefs." Young Decl. at ¶ 1. He further explains that "[Civilization] classes for NGE adherents help others who are not as advanced in the teachings by learning from a facilitator who is more advanced." *Id*. at ¶ 7. Young notes that NGE practices have drawn him "closer to a life of righteousness. . . . help to continue [his] self-improvement, responsibility, and shape [his] character." *Id*. at ¶ 9. Yet, the Protocols deny him these "benefits because inspiration and motivation comes from our Civilization (study group) classes, Rallies and Parliaments." *Id*.

Based upon our review of the documents submitted in support of and against summary judgment, we find that both Plaintiffs have established that NGE practices are, for First Amendment purposes, religious in their scheme of beliefs and such beliefs are sincerely held. With regard to the restrictions on displaying NGE symbols or texts, it is not entirely clear to this Court how central open display of symbols and texts play in the practice of NGE, nor how such rules pose substantial burdens on the Plaintiffs' ability to practice their beliefs.[11] We understand the Plaintiffs' desire to

---

[11] However, as noted below, there are equal protection concerns with such restrictions.

be open about their beliefs, but the restriction against displaying symbols and texts do not, themselves, burden the free exercise of religion.  For example, NGE adherents are required to register with the facility deputy superintendent for programs, and there is nothing prohibiting their ability to inform other inmates and facility personal that they adhere to NGE teachings, thus, they are not living under a *per se* shroud of secrecy.  In any event, nothing before us establishes that such display is a central part of being an NGE adherent.  The same cannot be said about the restrictions on wearing a crown and having congregative opportunities.  We find that the restrictions on wearing crowns and on NGE congregative activity infringes the Plaintiffs' sincerely held beliefs, and for RLUIPA purposes, substantially burden their ability to practice their beliefs.[12]

Throughout his deposition, Bonilla explains how integral congregation is to NGE practice and how it enables an NGE adherent to fully develop and understand the crucial teachings.  Bonilla Dep. at pp. 13 (discussing a Parliament he attended), 27-28 (describing a Rally), 31 (equating NGE congregation to going to church), 33 (describing Honor Days), 41 (importance of congregating),[13] 44-45 (congregation is important for members with lesser understanding), & 53 (stating that Allah Show and Prove Honor Day is not effective without congregant activity).  According to Bonilla, without the ability to congregate and share individual comprehension of the 120 Degrees, Supreme Mathematics, and Supreme Alphabet, an NGE member may never attain true understanding and

---

[12] *See Wright v. Fayram*, 2012 WL 2312076, at *13 (N.D. Iowa June 18, 2012) ("I believe Defendants' refusal to allow [NGE] group worship clearly places a substantial burden on [plaintiff's] free exercise of religion.")

[13] The following colloquy from the Deposition is worth repeating here:

Q:      [W]hat part of your religion are you not being allowed to practice?
A:      Meeting together, bringing a spiritual bondage, which is an integral part, and having study classes to educate ourselves more within our Nation.  And that plays a big part of us being spiritually – spiritually able to accept and work with the responsibilities that's on the outside of the world[.]

Bonilla Dep. at p. 41.

*-17-*

righteousness.  *Id*. at pp. 28, 41, 44-45, & 53.  Bonilla further explains that the crowns, which are customary for men to wear, are utilized during Parliaments to symbolize status within NGE and alerts newer or less experienced members of someone "qualified to answer some questions."  *Id*. at p. 52.  Young expresses the same sentiments in his Declaration.  Young Decl. at ¶¶ 4 & 9.

It is important for us to acknowledge here that the Protocols do not include a total ban on congregation, as there is an allotment for one-on-one study with an outside person during regular visiting hours.  However, based upon the submissions before this Court, it seems that this allowance falls short in providing NGE inmates with meaningful congregative opportunity by which they can learn/teach one another about the various lessons and tenets of NGE.  The only other opportunity afforded to these inmates to congregate is during recreation time in the yard, yet, this is not a controlled setting by which NGE adherents could sit, discuss, and learn, but rather is during a time when distractions abound and limits are put on how many inmates can congregate at once.  *See* Bonilla Dep. at p. 42 (noting that they aren't allowed to be in groups larger than six during this time and that "too many distractions, people walk by. . . . [i]t distracts your train of thought").  Based upon these submissions, we find that there is a *prima facie* showing of a First Amendment and RLUIPA violations pertaining to the ban on NGE congregation and wearing crowns.

First Amendment and RLUIPA claims each contain a burden-shifting analysis.  In the case of the First Amendment, once a prisoner has established a constitutional violation, as the present case has been shown to do, the prison officials' conduct may still be valid if they can show that their policies are reasonable.  Then, "once prison officials put forward a legitimate penological interest to justify an infringement upon a prisoner's religious free exercise, the burden remains with the prisoner to 'show that these [penological] concerns were irrational.'"  *Ford v. McGinnis*, 352 F.3d

at 595-96 (quoting *Fromer v. Scully*, 874 F.2d 69, 74 (2d Cir. 1989)).  The Supreme Court has

enumerated factors for courts to consider when ruling upon the reasonableness of a prison policy:

> [1] there must be a 'valid, rational connection' between the prison regulation and the
> legitimate governmental interest put forward to justify it [citation omitted][;]
> [2] whether there are alternative means of exercising the right that remain open to
> prison inmates[;]
> [3] the impact accommodation of the asserted constitutional right will have on guards
> and other inmates, and on the allocation of prison resources generally[; and]
> [4] the absence of ready alternatives is evidence of the reasonableness of a prison
> regulation.

*Turner v. Safley*, 482 U.S. at 89-91.

In the case of RLUIPA, once a plaintiff meets his burden of showing a substantial burden on his

exercise of religion, as has been shown here in terms of congregative opportunities, the evidentiary

burden shifts to the defendant, who must show that the regulation (1) is in furtherance of a

compelling governmental interest and (2) is the least restrictive means of furthering such interest.

42 U.S.C. § 2000cc-2(b).

In support of the Protocols, Defendants submit the Declaration of Anthony Annucci,

Executive Deputy Commissioner of DOCCS.  Dkt. No. 67-2.  The first portion of the Declaration

recounts the history of gang activity perpetrated by individuals referring to themselves as "Five

Percenters."  *Id*. at ¶¶ 5-14.  This is followed by a rendition of the evolution of the Protocols, in

which he played a dominant role in facilitating insofar as he was at that time Deputy Commissioner

and Counsel for DOCCS; he also includes a recitation of the Protocols with reasons why each were

instituted in such limited fashion.  *Id*. at ¶¶ 15-30.  While there is no specific mention of why crowns

are banned, Defendant Annucci notes that NGE materials and insignia are not allowed to be

displayed "in order to minimize the potential for these materials to be exploited as a means of gang

affiliation, initiation or recruitment."  *Id* at ¶ 21.  In explaining the ban on congregative activities,

he explains that Rallies and Parliaments "could potentially attract larger groups of inmates or provide opportunities for rival groups to identify and target each other." *Id.* at ¶ 26.  He further explains that larger groups are harder to control and that these gatherings provide opportunities for fights and assaults and the ability of security staff to provide rapid response is hindered. *Id.* at ¶ 27.

Deputy Commissioner Annucci concludes his Declaration with the following statements:

> 32.  DOCCS' interest in minimizing the opportunities for gang related conflicts remains imperative, and has not diminished since the determination in [*Marria III*, the S.D.N.Y. decision that upheld the Protocols].
> 33.  Although reduced somewhat from 1990s levels, gang recruitment, and gang against gang violence continue to be a threat to prison security.  Any success in the containment of such activities, is due, at least in part, to strict prohibitions on unauthorized congregate activities, the confiscation of gang related paraphernalia, and the prohibition on the display of gang paraphernalia.
> 34.  The fiscal hardships that I attested to in support of the Protocols in [*Marria III*] – a state budget crisis, a downsizing of security staff, and strict orders to minimize overtime expenditures – remain existent.  *See Id.* *2.

*Id.* at ¶¶ 32-34.

It is fair to note at this point that the Plaintiffs in our case avow that they are not now nor ever have been members of gangs and that the teachings of NGE prohibit such violent activity. Young Decl. at ¶ 2 ("The Nation is not a gang and its teachings do not encourage gang behavior for this would be in violation of Nation tenets, i.e. 'What is the duty of a civilized person? Answer: The duty of a civilized person is to teach he who is savage, civilization, righteousness, the knowledge of himself, and the science of everything in life; love, peace, and happiness' (Quoted from the 18[th] lesson in the 1-40.).");  Bonilla Decl. at ¶ 1 ("I am not a gang member nor do I associate with gang members.   The Nation's teachings do not condone or advocate gang beliefs or behavior."). Furthermore, both Plaintiffs claim, and Defendants do not refute, that they have never been disciplined during their tenure with DOCCS, have never disobeyed any rules, and have never been segregated from the general population.  Young Decl. at ¶ 7; Bonilla Decl. at ¶ 13.

*-20-*

Notably, Deputy Commissioner Annucci does not provide a scintilla of evidence, new or old, of the security concerns at issue, but instead categorically states that they exist and urges this Court to simply adopt the same findings made by District Judge Buchwald in 2004. Indeed, in making her rulings in *Marria II*, Judge Buchwald noted that while we, the judiciary, are directed to defer to prison officials on security matters, the prisons officials "cannot merely brandish the words 'security' and 'safety' and expect that their actions will automatically be deemed constitutionally permissible conduct." *Marria II*, 2003 WL 21782633, at *14 (quoting *Campos v. Coughlin*, 854 F. Supp. 194, 204 (S.D.N.Y. 1994) and further citing *Jolly v. Coughlin*, 76 F.3d 468, 479 (2d Cir. 1996) for the proposition that "[t]he DOCS policy is not insulated from scrutiny merely because the defendants brandish the concepts of public health and safety.").[14] We readily acknowledge that gang activity in prison is a valid concern for Defendants, and are of the mind to defer to prison officials on such matters of importance like safety and security. But, essentially, we are being asked to blindly rule in favor of the Defendants based upon evidence that was submitted to another judge almost nine years ago. And, it cannot be overlooked that much has changed since Judge Buchwald ultimately approved the Protocols in 2004. For one thing, access to the Supreme Mathematics and Supreme Alphabet was completely barred prior to the adoption of the Protocols, and it was DOCCS' stance at that time that such literature could/would be used as a code amongst Five Percenters/NGE inmates to foster gang recruitment and gang activity. As we know, this argument was shutdown by Judge Buchwald and sincere adherents to NGE are now allowed access to these texts, though they

---

[14] Interestingly, Judge Buchwald made this finding in *Marria II* after holding a bench trial. Prior to that, she issued a written decision denying summary judgment in spite of the deference usually accorded to prison officials on issues of security. *Marria I*, 200 F. Supp. 2d at 297-99 (noting that for First Amendment purposes, issues of fact remained regarding whether the total ban on NGE was reasonably related to security interests, and for RLUIPA purposes, issues of fact remained as to whether the total ban is the least restrictive means of accomplishing security concerns).

cannot be shared nor openly displayed.[15]  Have DOCCS' fears of increased gang activity come to fruition by virtue of allowing singular study of these texts?  Are inmates now exchanging codes to foster gang activity?  It seems incredulous that we are being asked to simply nod and wink and overlook religious freedom violations based on the very same arguments that were put forth, and in some sense struck down, in 2004.

    To be clear, we are not requiring the State to "prove the validity of [these] prison regulations," *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003), but at a minimum, they must come forward with some evidence to meet their burdens under *Turner* and on summary judgment beyond the conclusory statements provided by Defendant Annucci.  Defendant Annucci's statements do not provide us with enough information to gauge the reasonableness of the Protocols, nor to assess whether the limits placed on NGE congregative activity and wearing crowns is the least restrictive means available to accomplish valid security concerns, nor that accommodation of these requests would have more than a *de minimis* effect on valid penological interests.  *Turner v. Safley*, 482 U.S. at 89-91; *Allen v. Coughlin*, 64 F.3d 77, 81 (2d Cir. 1995) ("The degree to which the cost of [an alternative] is burdensome is an issue of fact not resolved by the conclusory affidavits submitted.").

---

[15] It is worth noting that Plaintiffs deny knowledge that these texts are used to send code messages.  Bonilla Dep. at pp. 57-58 (noting he does not associate with gangs and is unaware of what the so-called Five Percenters believe). Consider the following colloquy that took place at Bonilla's deposition:

> Q: Will you concede, Mr. Bonilla, that your supreme alphabet and your number system could be used to send messages about nefarious types of things?
> A: The same way Spanish people speak Spanish, yes.

Bonilla Dep. at p. 57; *see also Marria II*, 2003 WL 21782633, at *20 (quoting testimony from the trial undermining the idea that something published and made widely available on the internet and elsewhere could be used as a code, which, to be effective should be secret and unbreakable).  The *Marria* Court highlighted the analogy that the NGE texts could be used as a code the same way Spanish speaking inmates could pass information without correctional officers knowing:

> To ban the Mathematics and Alphabet because it is a code, you know, would be ludicrous.  If we do that, why don't we ban Spanish, for example, because I would daresay that there is not a tremendous number of correctional officers in DOCS that are bilingual and yet we allow Spanish not only to be spoken but documents inside institutions that are Spanish . . . and they are much more difficult to translate than this code would be.

*Marria II*, 2003 WL 21782633, *20 (quoting from trial testimony).

-22-

For example, it is unclear why NGE adherents cannot have the opportunity to meet once a week, as all other recognized religions do, to hold Civilization Classes, or, for that matter, once a month to participate in Parliaments and Rallies; Plaintiffs have even advocated for the presence of security during such meetings. *See*, *e.g.*, Bonilla Dep. at p. 31. And, if they are allowed to meet in this fashion, why the ban on wearing crowns while other religions are afforded these benefits? How do we know there isn't a problem with violence amongst and between other populations such as Jews, Muslims, Catholics, or Protestants? We have been made aware in other cases that there is disdain between Sunni and Shiite Muslims, yet, they are not banned from congregating together to celebrate their holy days.

Defendant Annucci notes that the Protocols allow inmates to meet one-on-one with an outside representative, an opportunity Plaintiff Bonilla admits he has rejected on principle. Annucci Decl. at ¶ 24; Bonilla Dep. at pp. 62-63. Yet, the fact that the Protocols allow for these one-on-one meetings during regular visiting hours does not, to the Plaintiffs and to this Court, seem to be sufficient to accomplish the congregative needs of NGE adherents, and without a supported basis being provided by Defendants for their security concerns, it is difficult for us to assess whether the restriction is reasonably related to the security concerns and whether it is the least restrictive means of accomplishing said security concerns. Plainly put, the conclusory statements offered to support the Defendants' stance of security/budget woes are insufficient to meet, as the moving party, the Defendants' burdens of production as well as persuasion, and as such, summary judgment is not appropriate. *See* 11 James Wm. Moore et al., Moore's Federal Practice § 56.13[1] (3d ed. 1999) (discussing burdens of production and persuasion on summary judgment motions); *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) ("The burden of demonstrating that

no material fact exists lies with the party seeking summary judgment." (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).  Thus, we recommend **denying** Defendants' Motion for Summary Judgment with regard to Plaintiffs' First Amendment and RLUIPA claims as it pertains to the Protocol restrictions on NGE congregative activities and wearing crowns.

### *2. Equal Protection*

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The Equal Protection Clause provides a basis for challenging legislative classifications that treat one group of persons as inferior or superior to others . . .and for contending that general rules are being applied in an arbitrary or discriminatory way." *Jones v. Helms*, 452 U.S. 412, 423-24 (1981) (further noting that equal protection claims are frequently "asserted by the members of a class of persons easily defined by a characteristic such as race, sex, alienage, illegitimacy, or religion"); *see also Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) ("To prove an equal protection violation, claimants must prove purposeful discrimination directed at an identifiable or suspect class.") (quoted in *Verdal v. Frantz*, 2002 WL 31309175, at *3 n.5 (N.D.N.Y. July 31, 2002)).  The Second Circuit has determined that the *Turner* standard of reasonableness (set forth above) applies to equal protection claims involving a prisoner's religious exercise. *See Benjamin v. Coughlin*, 905 F.2d 571, 575 (2d Cir. 1990); *see also Griffin v. Coughlin*, 743 F. Supp. 1006, 1010-11 (N.D.N.Y. 1990) (following the Second Circuit's directive and applying *Turner's* four factor reasonableness test to equal protection claims arising in the prison context).  "Thus, even if a plaintiff can demonstrate that two groups are similarly situated, different treatment might still be warranted if the state can demonstrate that the distinctions are 'reasonably related to legitimate penological

interests.'" *Vega v. Lantz*, 2009 WL 3157586, at *8  (D. Conn. Sept. 25, 2009) (quoting *Benjamin v. Coughlin*, 905 F.2d at 574).

Again, Defendants' request for summary judgment on Plaintiffs' equal protection claim suffers from the same infirmity – they have failed to carry their burden of production, thus precluding summary judgment.  Quite frankly, at this stage, there is no showing to this Court as to why, today, NGE adherents are still being treated differently than other religions recognized by DOCCS.  And, even if we were to defer to the security concerns based on past gang affiliation, it is unclear why NGE adherents are totally banned from congregating in a closed room with security personnel present in order to discuss the teachings of NGE.  Defendants seem to contend that NGE literature can be used as a code for fostering gang activity, and therefore they seek to limit the opportunities by which members can congregate as a means of inhibiting the exchange of coded information.  They also assert that there is a security concern when too many inmates congregate in one setting.  But there is no proscription nor limitation that we are aware of limiting the amount of inmates that can attend other religious services.  Nor is there, to our knowledge, any prohibition on general inmate congregating during recreation times.  Indeed, in support of the notion that alternate means of congregating are available to NGE adherents, Defendants highlight the ability of members to discuss NGE tenets during recreation time.[16]  Plaintiffs contest that too many distractions inhibit this time from being meaningful, but it seems that such time could easily be used to pass this coded information back and forth.  Now that NGE adherents have had access to their central texts, it would have been helpful to know from DOCCS whether there has been an increase

---

[16] This recreation congregative opportunity in the yard is not provided for in the Protocols and it appears to be DOCCS policy, formal or informal, that no more than six inmates may congregate at one time. Dkt. No. 67-4, Defs.' Mem. of Law, at p. 13.  At his Deposition, Bonilla explained that there are too many distractions during this time to allow for any meaningful discussion.  Bonilla Dep. at p. 42.

in gang related activity amongst the so-called "Five Percenters."  At least that would lend some credence to the idea that allowing them to congregate would foster the gang-related activity.  Based upon the limited submissions before this Court, it is clear that members of other religions are treated differently when it comes to congregative opportunities, as well as displaying religious symbols, texts, and wearing of religious head coverings.  *See* Bonilla Decl., Ex. A (memorandum listing the days and times of services/study classes for all recorded religions except NGE).  DOCCS Directive #4202 establishes the rules and regulations pertaining to religious worship and facility accommodation of various beliefs/practices.  This Directive sets forth many accommodations made for members of Jewish, Muslim, and Native American beliefs, to name a few, including the ability to congregate, celebrate/observe holy days, possess religious texts, and wear religious headcoverings.[17]  There is even a section that allows inmates to have shrines.  Yet, because of the Protocols, NGE adherents, despite being recognized as a valid religion for First Amendment purposes, are excepted from virtually every accommodation made for other validly recognized religion.  Again, because the Defendants have provided no evidence by which we can assess the reasonableness of their restrictive Protocols, we must recommend **denying** their Motion for Summary Judgment as it pertains to Plaintiffs' equal protection claims regarding displaying NGE symbols and the Universal Flag, wearing crowns, and congregating for services, classes, and on Honor Days.

### III.  CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment be **granted in part**

---

[17] This Directive approves the wearing of a Kufi, but specifically disallows the Kufi to have "protrusions" such as tassels.

**and denied in part** as noted below:

    1) Defendants' Motion for Summary Judgment be **granted** as to Defendant Nichols and that he be **dismissed** from this action;

    2) Defendants' Motion for Summary Judgment be **granted** as to First Amendment and RLUIPA claims based upon the restrictions on displaying NGE symbols, Universal Flag, and texts;

    3) Defendants' Motion for Summary Judgment be **denied** as to First Amendment and RLUIPA claims based upon the restrictions on NGE congregative opportunities and on wearing crowns;

    4) Defendants' Motion for Summary Judgment be **denied** as to all equal protection claims; and it is further

    **RECOMMENDED**, that Defendant Keller be **dismissed** from this action as the claims against him were rendered moot with the dismissal of Plaintiff Panayoty; and it is further

    **ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

    Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

Date:   August 16, 2012
        Albany, New York

_____
Randolph F. Treece
U.S. Magistrate Judge